# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| VICKIE FORBY, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action 3:16-CV-856-L |
| ONE TECHNOLOGIES, LP; ONE TECHNOLOGIES MANAGEMENT LLC; and ONE TECHNOLOGIES CAPITAL LLP, | § § § § § § | |
| Defendants. | § § | |

## SECOND AMENDED COMPLAINT

Plaintiff, Vickie Forby, individually and on behalf of all others similarly situated, alleges the following facts and claims upon personal knowledge, investigation of counsel, and information and belief.

## NATURE OF THE CASE

1. This case arises out of Defendants' deceptive, unfair, and misleading marketing and advertising tactics by falsely offering "free" credit reports as a ruse to enroll consumers in an ongoing, negative-option credit monitoring program that they did not want, they did not consent to, they did not agree to pay for, and Defendants made next to impossible to cancel.

2. Plaintiff brings this case to recover damages for Defendants' false, deceptive, unfair, and misleading marketing and advertising in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") and Illinois common law, as well as for Defendants' unfair business practices in violation of the Federal Credit Repair Organization Act ("CROA").

## PARTIES

3. Plaintiff, Vickie Forby, is a resident of St. Clair County, Illinois. On or about July 7, 2014, Plaintiff was directed to Defendants' Scoresense.com website, where she was offered a "free" credit report. Plaintiff entered her credit card information, authorizing Defendants to charge her $1.00 to verify her identity and/or to obtain her credit report for personal, family, or household purposes. Plaintiff did not knowingly authorize Defendants to charge her credit card any other amounts or to enroll in her credit monitoring services. Seven days later—on July 14, 2014—Defendants, without authorization, charged Plaintiff's credit card $29.95. On August 12 and September 12, 2014, Defendants again charged Plaintiff's credit card $29.95. Upon realizing that Defendants were charging her credit card without authorization, Plaintiff contacted Defendants at least once by telephone after September 12, 2014 and demanded that Defendants stop making unauthorized charges on her credit card. But Defendants still did not stop. On October 14, November 12, and December 15, 2014, Defendants charged Plaintiff's credit card repeatedly again despite her demand that they stop doing so. Plaintiff's experience is typical of the experiences of the proposed class members.

4. Defendant One Technologies, LP is a Delaware limited partnership with its principal place of business at 8144 Walnut Hill Lane, Suite 600, Dallas, Texas 75231. One Technologies, LP has done business as ScoreSense, One Technologies, Inc., and MyCreditHealth. One Technologies, LP transacts or has transacted business in this county and throughout the United States.

5. Defendant One Technologies Management, LLC is a Texas limited liability company with its principal place of business at 8144 Walnut Hill Lane, Suite 600, Dallas, Texas 75231. One Technologies Management, LLC is the general partner of Defendant One Technologies, LP. One Technologies Management, LLC transacts or has transacted business in this county and throughout the United States.

6. Defendant One Technologies Capital, LLP is a Texas limited liability partnership with its principal place of business at 8144 Walnut Hill Lane, Suite 600, Dallas, Texas 75231. One Technologies Capital, LLP is the limited partner of Defendant One Technologies, LP. One Technologies Capital, LLP transacts or has transacted business in this county and throughout the United States.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which: (a) there are over 100 members in the proposed class; (b) at least one member of the proposed class is a citizen of a different state than Defendant; and (c) the claims of the proposed class members exceed five million dollars ($5,000,000.00), exclusive of interest and costs.

8. This Court has personal jurisdiction over Defendants because Defendants are registered to do business in and are citizens of and are domiciled in the State of Texas.

9. Venue is proper under 28 U.S.C. § 1391(a), (b)(1) and (c)(2) because Defendants are subject to personal jurisdiction in and are residents of this Judicial District.

## SUMMARY and FACTS

10. From at least 2008 until at least December 2014, Defendants used deceptive marketing tactics to enroll consumers clandestinely in Defendants' credit monitoring program and charge them repeatedly without their knowledge or authorization.

11. On their websites, Defendants offered Plaintiff and consumers "free" online access to their credit scores, but failed to disclose, or failed to adequately disclose, that by accessing their "free" score, Plaintiff and consumers would be enrolled in Defendants' negative-option credit monitoring program and would incur a $29.95 recurring monthly fee. Although some of Defendants' websites contained statements about the recurring charge, those statements were

neither conspicuous nor adequate to inform consumers about the true nature of Defendants' scheme. Accordingly, Plaintiff's and consumers' impression of Defendants' websites, advertisements, and marketing was that Defendants offered consumers "free" credit scores with no further payment obligation.

12. Defendants caused millions of dollars in injury to consumers by enrolling them in Defendants' credit monitoring program without consumers' knowledge or authorization. On information and belief, over 200,000 consumers have complained about Defendants' business practices to their banks, their credit card companies, a law enforcement agency, or the Better Business Bureau.

13. The FTC and two state Attorneys General have also filed a complaint arising out of Defendants' deceptive practices, resulting in injunctive and monetary relief in the amount of $22,000,000.

### The FTC Action

14. On November 12, 2014, the Federal Trade Commission and the Attorneys General for the States of Illinois and Ohio filed a complaint against Defendants in the federal district court for the Northern District of California arising out of the allegations complained of herein.

15. On November 21, 2014, Defendants entered into a Stipulated Order in which they agreed to correct their misleading practices and to pay the sum of $22,000,000 in compensatory damages.

16. As of December 15, 2014—the day on which Plaintiff's credit card was charged without authorization—Defendants were still not in compliance with the Stipulated Order.

### Defendants' Business

17. In 2008, Defendants launched MyCreditHealth, a product that monitors consumers' credit reports for fraudulent activity and provides access to their credit score.

18. In early 2010, Defendants launched ScoreSense, a product substantially similar to MyCreditHealth.

19. For the purposes of this Complaint, "Defendants' credit monitoring program" means MyCreditHealth, ScoreSense, ScoreTracker, and all similar products offered by Defendants.

### Defendants' "Free" Credit Score Offer and Enrollment Scam

20. Defendants marketed their credit monitoring program through at least 50 websites, including FreeScore360.com, FreeScoreOnline.com, and ScoreSense.com.

21. Defendants attracted consumers like Plaintiff to their websites by offering "free" credit scores. Consumers know that credit scores are important because financial institutions use credit scores to determine whether to extend credit to a consumer, and some employers and property owners also use a consumer's credit score before transacting business with the consumer. Defendants preyed on consumers' interest in and fears about their credit scores by offering a "free" chance to review their credit scores.

22. Defendants purchased keyword advertising on search engines, such as Google and Bing. As a result, consumers who entered terms such as "free credit report" into the search engine often saw an ad for one or more of Defendants' websites near the top of the search results, in the sponsored links or ads section. Defendants' most prominent online ad stated, "View your latest Credit Scores from All 3 Bureaus in 60 seconds for $0!"

23. Defendants also enticed consumers to visit their websites through email solicitations. The emails often informed consumers that "Your Complimentary Credit Scores Are Waiting For You."

### Defendants' Misleading Sign-Up Process

24. Consumers generally learned about Defendants' websites through Defendants' search engine ads or through offers from third-party affiliate marketers, whom Defendants paid to

direct consumers to Defendants' websites. All consumers who clicked on links in Defendants' ads or their affiliate marketers' offers were directed to an online sign-up path controlled by Defendants.

25. Landing Page: The first webpage consumers saw upon arrival to any of Defendants' websites was the landing page ("Landing Page"). The focal point of the Landing Page was a blank form, that in some instances was emphasized by large arrows, asking consumers to enter their name, email address, and zip code. A large, brightly colored button labeled "Get Yours Now," "View Your Free Scores Now," or similar language sat below or next to the blank entry fields.

26. Address Form: Consumers who clicked the button on the Landing Page to access their "free" credit score were directed to a page that requested more personal information, including their name, address, and phone number ("Address Form"). A large, brightly colored button labeled "Submit & Continue" or similar language sat at the bottom of this page.

27. Social Security Form: Consumers who completed the Address Form and clicked the large "Submit & Continue" button were directed to a webpage that requested the consumers' Social Security number and birthdate ("Social Security Form"). A large, brightly colored button labeled "Continue" or similar language sat at the bottom of the page.

28. Verification Form: Consumers who completed the Social Security Form and clicked "Continue" were directed to a webpage that asked several questions based on information in the consumers' credit report to verify the consumers' identity ("Verification Form"). After consumers verified their identity, a screen popped up, stating, "[W]e're processing your information and will be done shortly."

29. Payment Form: After a few moments, the pop-up screen expanded to feature a bar graph comparing the consumer's debt to an average consumer's debt ("Payment Form"). The screen also proclaimed, "[Y]our credit scores are ready!", and directed consumers to enter credit or debit card information in the "Verification Information" section. Immediately above the credit

card field was the following statement or similar language: "Tell us which card you would like to use for our $1.00 refundable processing fee," which led consumers to believe that Defendants needed their debit or credit card information to verify their identity or to charge a $1.00 fee to process their credit score. A large, brightly colored button labeled "View Scores" or similar language sat near the bottom of the pop-up screen.

30. Confirmation Page: Consumers who completed the Payment Form and clicked "View Scores" were directed to a page that states, "Thank You – your order is complete," or similar language ("Confirmation Page"). This page displayed the consumer's membership number for Defendants' credit monitoring program. Directly below the membership information sat a large, brightly colored "Continue" button.

31. Credit Monitoring Homepage: Consumers who clicked "Continue" were directed from the Confirmation Page to the home page of Defendants' credit monitoring program, which finally displayed consumers' "free" credit scores from various credit bureaus ("Home Page"). The Home Page also featured general information about identity protection and credit pitfalls, in addition to a large button requesting to "Learn More" about Defendants' "Complete Monitoring Package." [1]

32. Believing they had only signed up to receive their free credit scores, Plaintiff and consumers did not know they had actually been enrolled in Defendants' negative-option credit monitoring program until they discovered a $29.95 charge on their bank or credit card statement. In Plaintiff's case, Defendants made the first $29.95 charge within seven days. Many consumers did not notice the recurring charge for several billing cycles, allowing Defendants to reap more ill-gotten gains.

**Defendants' Sham Cancellation Policy**

---

[1] Consumers who visited Defendants' websites on a mobile device experienced a sign-up process similar to that described in the Paragraphs above.

33. Plaintiff and consumers who wanted to stop recurring charges for Defendants' credit monitoring program had to call Defendants' toll-free customer service number. Defendants did not permit consumers to cancel their membership online or via email.

34. Many consumers, including Plaintiff, have called Defendants' customer service number to cancel their membership and to request a refund. Many consumers, including Plaintiff, informed Defendants' agents that they were unaware that they had been enrolled in Defendants' credit monitoring program and that they did not authorize Defendants to enroll them or to charge their credit cards repeatedly. Some consumers had to call Defendants' customer service department multiple times to cancel their membership in the program.

35. In numerous instances, Defendants denied refunds to consumers who claimed they did not knowingly enroll in Defendants' credit monitoring program.

36. In other instances, including in the experience of Plaintiff Forby, Defendants continued to charge consumers' credit cards repeatedly, even after Plaintiff called and demanded that such charges be stopped.

## **Defendants' Credit Repair Organization Status**

37. The CROA defines a "Credit Repair Organization" as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)." 15 U.S.C. § 1679a(3).

38. In connection with Defendants' credit monitoring programs, Defendants advertised "Credit Specialists" who would "help you make sense of your credit, pinpoint the factors most affecting your scores and understand why."

39. Defendants also advertised tools to help consumers "detect and correct score-lowering credit errors," including a Dispute Center that provides "a step-by-step guide for navigating the process with all three bureaus to file a credit dispute."

40. Defendants' credit monitoring programs also advertised "Daily Credit report Monitoring" that would detect and "minimize the damage that reporting errors, delinquent payments and account fraud can do to your credit score."

41. Defendants' credit report monitoring also included tools called "ScoreTracker" and "ScoreCast". Defendants advertised ScoreTracker as a tool to "track your progress from month to month to help you reach your credit goals." Defendants advertised ScoreCast as a "score simulator that shows you how your score may change after you take a certain action."

42. Defendants' credit repair tools, including Credit Specialists, the Dispute Center, ScoreTracker, and ScoreCast, individually and collectively, constitute services sold, performed, or in return for the payment of money or other valuable consideration, for the express or implied purpose of improving any consumer's credit record, credit history, or credit rating. Defendants' credit repair tools also constitute the provision of advice or assistance to any consumer with regard to the express or implied purpose of improving any consumer's credit record, credit history, or credit rating.

43. As a result, Defendants are Credit Repair Organizations as defined in the CROA.

## CLASS ALLEGATIONS

44. Pursuant to FRCP 23, Plaintiff brings this action on her own behalf and on behalf of a proposed class of all other similarly situated persons ("Class Members" of the "Class") consisting of:

> All citizens of Illinois whom Defendants enrolled in their credit monitoring program during the Class Period.

45. Excluded from the Class are: (a) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (b) any entity in which Defendant has a controlling interest, to include, but not limited to, their legal representative, heirs, and successors; (c) any judicial officer in the lawsuit and/or persons within the third degree of consanguinity to such judge.

46. Upon information and belief, the Class consists of hundreds or thousands of purchasers. Accordingly, it would be impracticable to join all Class Members before the Court.

47. There are numerous and substantial questions of law or fact common to all of the members of the Class and which predominate over any individual issues. Included within the common question of law or fact are:

  a. whether Defendants' "free" credit score offer was false, deceptive, unfair, and misleading;

  b. whether Defendants' enrollment process for their credit monitoring program was false, deceptive, unfair, and misleading;

  c. whether Defendants violated the ICFA by enrolling consumers in their credit monitoring program without their knowledge or consent;

  d. whether Defendants violated the CROA by charging consumers for credit repair services before such services were fully performed;

  e. whether Defendants violated the CROA by failing to provide consumers with a copy of the notice required by 15 U.S.C. § 1679c(a);

  f. whether Defendants violated the CROA by failing to provide consumers with the right to cancel notice required by 15 U.S.C. § 1679e;

  g. whether Defendants violated the CROA by attempting to obtain consumer rights' waivers in violation of 15 U.S.C. § 1679f(b);

  h. whether Defendant's cancellation policy was false, deceptive, unfair, and misleading; and

  i. the proper measure of damages sustained by Plaintiff and Class Members.

48. The claims of the Plaintiff are typical of the claims of Class Members, in that they share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiff and Defendants' conduct affecting Class Members, and Plaintiff has no interests adverse to the interests other Class Members.

49. Plaintiff will fairly and adequately protect the interests of Class Members and have retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in consumer protection litigation.

50. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

    a. the common questions presented in this case predominates over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

    b. absent a Class, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy its ill-gotten gains;

    c. given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    d. when the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

    e. this action presents no difficulty that would impede its management by the court as a class action, which is the best available means by which Plaintiff and members of the Class can seek redress for the harm caused to them by Defendants.

51. Because Plaintiff seeks relief for the entire Class, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications

with respect to individual member of the Class, which would establish incompatible standards of conduct for Defendants.

52. Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members of the Class who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for the fair and efficient adjudication of the issues in this case.

## CAUSES OF ACTION

### Count One
### Illinois Consumer Fraud Act

53. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

54. The ICFA declares the following to be unlawful: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of any trade or commerce[.]" 815 Ill. Comp. Stat. Ann. 505/2

55. Defendants' conduct in offering consumers "free" or $1.00 online access to their credit scores, but failing to disclose, or failing to disclose adequately, that consumers would in fact be enrolled in Defendants' credit monitoring program and would incur a $29.95 recurring monthly fee until they called Defendants to cancel their membership constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendants' trade or commerce.

56. Moreover, Defendants failed to disclose, or failed to disclose adequately, to consumers the material terms and conditions related to the costs of the "free" offer, including:

- that Defendants would automatically enroll consumers in a negative option credit monitoring program with additional charges;

- that consumers must affirmatively cancel the negative option credit monitoring program before the end of a trial period to avoid additional charges;

- that Defendants would use consumers' credit card information to charge consumers monthly for the negative option credit monitoring program;

- the costs associated with the negative option credit monitoring program; and

- the means consumers must use to cancel the negative option program to avoid additional charges.

57. Defendants intended that Plaintiff and the Class Members would rely on the representation that their services were free when they in fact were not, and on the omission of the material facts above, including that Defendants intended to enroll Plaintiff and Class Members in the credit monitoring program and would charge them $29.95/month.

58. Defendants committed the unfair and deceptive acts in the conduct of its trade and commerce.

59. Defendants' practice of advertising and selling its services as "free" when they are not and of enrolling Plaintiff and Class Members in the credit monitoring program without authorization and repeatedly charging their credit cards offends public policy and is immoral, unethical, and unscrupulous.

60. Defendants further engaged in a course of trade or commerce which constitutes unfair and deceptive acts or practices declared unlawful under the ICFA by:

- failing to clearly and conspicuously disclose the material fact that consumers were being signed up for a 7-day free trial which would automatically bill consumers' credit cards until they cancelled by telephone;

- unfairly assessing a monthly charge against consumers' credit cards without obtaining the express, informed consent of consumers to assess such charges;

- representing expressly or by implication that Defendants offer free credit scores when, in fact, access to such credit scores cost consumers $1;

- misrepresenting the purpose for obtaining a consumer's credit or debit card number; and

- failing to honor consumer cancellation requests.

61. Defendants' conduct causes substantial injury to consumers. Thousands and thousands of consumers have been misled into and charged for credit monitoring services they did not want, typically at the price of $29.95 a month.

62. Plaintiff and Class Members suffered damages as a result of Defendants' unlawful conduct as alleged herein.

### Count Two
### Violations of the Credit Repair Organizations Act

63. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

64. The CROA prohibits a credit repair organization: (i) from making or using any untrue or misleading representation of its services (15 U.S.C. § 1679b(a)(3)), (ii) from engaging, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization (15 U.S.C. § 1679b(a)(4)), (iii) from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed (15 U.S.C. § 1679b(b)), and (iv) from attempting to obtain a waiver of any consumer protection provided under the CROA (15 U.S.C. § 1679f(b)).

65.     Pursuant to 15 U.S.C. § 1679c(a), the CROA requires a credit repair organization to provide consumers with the following written statement before any contract or agreement between the consumer and the credit repair organization is executed:

**Consumer Credit File Rights Under State and Federal Law**

You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

> If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.
>
> The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:
>
> > The Public Reference Branch
> > Federal Trade Commission
> > Washington, D.C. 20580

66. The CROA requires the statement to be provided to the consumer as a separate document separate and apart from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.

67. The CROA also requires the credit repair organization to provide the consumer with a right to cancel any contract with the credit repair organization, without penalty, at any time before midnight of the third business day which begins after the date on which the contract or agreement between the consumer and the credit repair organization is executed. 15 U.S.C. § 1679e(a). Each contract between the consumer and the credit repair organization is required to be accompanied by a notice of the consumer's right to cancel the contract containing the following statement:

> You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.
>
> To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]
>
> I hereby cancel this transaction,
>
> [date]
>
> [purchaser's signature].

15 U.S.C. § 1679e(b).

68. Defendants' conduct in offering consumers "free" or $1.00 online access to their credit scores, but failing to disclose, or failing to disclose adequately, that consumers would in fact be enrolled in Defendants' credit monitoring program and would incur a $29.95 recurring monthly fee until they called Defendants to cancel their membership constitutes a fraud or deception on Plaintiff and Class Members in connection with the offer or sale of Defendants' services.

69. Defendants further engaged in conduct declared unlawful under the CROA by:

- charging or receiving money for credit repair services before such services were fully performed;
- failing to provide Plaintiff and Class Members with the notice required by 15 U.S.C. § 1679c(a);
- failing to provide Plaintiff and Class Members with the right of cancelation and accompanying notice required by 15 U.S.C. § 1679e(b);
- attempting to obtain a waiver of the protections afforded to Plaintiff and Class Members pursuant to the CROA as prohibited by 15 U.S.C. § 1679f(b).

70. Defendants' conduct in violation of the CROA has caused and continues to cause substantial injury to consumers. Thousands and thousands of consumers have been misled into and charged for credit monitoring services they did not want, typically at the price of $29.95 a month.

71. Plaintiff and Class Members suffered damages as a result of Defendants' unlawful conduct as alleged herein.

72. As a result of Defendants' violations of the CROA, Plaintiff and Class members are entitled to actual damages equal to the greater of (a) the amount of any actual damage sustained or (b) any amounts paid to the Defendants. 15 U.S.C. § 1679g(a)(1).

73. In the case of an individual action, Plaintiff is entitled to such additional damages as the Court may allow. 15 U.S.C. § 1679g(a)(2)(A).

74. In the case of a class action, the Class Members are entitled to the sum of (a) the aggregate of the amount which the Court may allow for each named plaintiff, and (b) the aggregate

of the amount which the Court may allow for each other class member, without regard to any minimum individual recovery. 15 U.S.C. § 1679g(a)(2)(B).

75. Plaintiff and Class Members are additionally entitled to the costs of this action, along with reasonable attorneys' fees. 15 U.S.C. § 1679g(a)(3).

76. Plaintiffs and Class Members may also be entitled to punitive damages in the Court's discretion based on consideration of (a) the frequency and persistence of noncompliance by Defendants, (b) the nature of the noncompliance by Defendants, (c) the extent to which such noncompliance was intentional, and (d) the number of consumers adversely affected. 15 U.S.C. § 1679g(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all similarly situated persons, prays the Court:

a. grant certification of this case as a class action;

b. appoint Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

c. award compensatory damages to Plaintiff and the proposed Class, or, alternatively, require Defendants to disgorge or pay restitution of its ill-gotten gains;

d. award pre- and post-judgment interest;

e. award reasonable and necessary attorneys' fees and costs; and

f. for all such other and further relief, as may be just and proper.

Dated:  May 7, 2019　　　　　　　　　　Vickie Forby, individually, and on behalf of all others similarly situated, Plaintiff

　　　　　　　　　　　　By:　 /s/ David C. Nelson
　　　　　　　　　　　　　　　David C. Nelson (appearing Pro Hac Vice)
　　　　　　　　　　　　　　　NELSON & NELSON, ATTORNEYS AT LAW, P.C.
　　　　　　　　　　　　　　　420 North High Street
　　　　　　　　　　　　　　　Belleville IL 62220
　　　　　　　　　　　　　　　Tel:　   618-277-4000
　　　　　　　　　　　　　　　Email: dnelson@nelsonlawpc.com

　　　　　　　　　　　　　　　Matthew H. Armstrong (appearing Pro Hac Vice)
　　　　　　　　　　　　　　　ARMSTRONG LAW FIRM LLC
　　　　　　　　　　　　　　　8816 Manchester Rd., No. 109
　　　　　　　　　　　　　　　St. Louis MO 63144
　　　　　　　　　　　　　　　Tel:　   314-258-0212
　　　　　　　　　　　　　　　Email:  matt@mattarmstronglaw.com

　　　　　　　　　　　　　　　Craig D. Cherry
　　　　　　　　　　　　　　　HALEY OLSON, P.C.
　　　　　　　　　　　　　　　100 Ritchie Road, Suite 200
　　　　　　　　　　　　　　　Waco TX 76712
　　　　　　　　　　　　　　　Tel:　   254-776-3336
　　　　　　　　　　　　　　　Email:  ccherry@haleyolson.com

　　　　　　　　　　　　　　　*Attorneys for Plaintiff and the Putative Class*